IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LARRY EUGENE SCHRADER, | ) | Civil No. 3:10-cv-06287-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Robert A. Baron
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, OR 97401

Attorneys for Plaintiff

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902
Richard Rodriguez

FINDINGS AND RECOMMENDATION – 1

Special Asst. U.S. Attorney
Office of General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Larry Schrader brings this action against the Commissioner of Social Security (the Commissioner) pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision denying his application for Social Security Disability Benefits (DIB). Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits. In the alternative, Plaintiff asks that the action be remanded for further proceedings.

For the reasons set out below, the decision of the Commissioner should be reversed and the action should be remanded to the Agency for an award of benefits.

## **Procedural Background**

Plaintiff filed an application for DIB on April 15, 2008, alleging that he had been disabled since May 1, 2007. After his application had been denied initially and upon reconsideration, he timely requested a hearing before an Administrative Law Judge (ALJ).

On June 9, 2009, a hearing was held before ALJ Marilyn Mauer. On July 16, 2009, ALJ Mauer issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act (the Act). That decision became the final decision of the Commissioner on July 3, 2010, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff seeks review of that decision.

FINDINGS AND RECOMMENDATION – 2

**Factual Background**

Plaintiff was born on July 5, 1960, and was 48 years old at the time of the hearing before the ALJ.  He left high school during 10th grade, and later obtained a GED.  Plaintiff has a long history of back and leg pain related to a logging accident that occurred more than 20 years before the hearing.  He has past relevant work as a foster care assistant.  He suffered a back injury in December, 2006, and has not worked since that time.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the

impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A

claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or

equal one listed in the regulations, the Commissioner's evaluation of the claimant's case

proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work

he or she has done in the past.  A claimant who can perform past relevant work is not disabled.

If the claimant demonstrates he or she cannot do work performed in the past, the

Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R.

§ 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other

work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that

the claimant is able to do other work, the Commissioner must show that a significant number of

jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this

burden through the testimony of a vocational expert (VE) or by reference to the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the

Commissioner demonstrates that a significant number of jobs exist in the national economy that

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this

burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  Id.

FINDINGS AND RECOMMENDATION – 4

**Medical Record**

Dr. Allen Goodwin, a physical medicine and rehabilitation specialist, examined Plaintiff for low back pain on January 26, 2006.   An MRI Dr. Goodwin ordered showed disc desiccation at L5-S1 and a central annular protrusion at L5-S1.

Dr. Scott Kitchel examined plaintiff on April 19, 2007.  Dr. Kitchel noted that imaging showed severe L5-S1 degeneration with bony inflammatory changes.  He diagnosed lumbar disc degenerative  disease, instability, and canal stenosis, and recommended surgical decompression and fusion.

On May 9, 2007, Dr. Kitchel performed a complete laminectomy at L5, partial laminectomies at L4 and S1, and a posterolateral fusion at L5 to S1.  Plaintiff did well for a short time following surgery, but within a few months developed numbness from his right leg into his right foot and numbness in his left big toe.  In July, 2007, he complained of increasing neck pain and numbness and tingling in both hands.

In August, 2007, Plaintiff complained of neck, upper back, and radicular arm pain.  Dr. Kitchel noted positive Spurling's maneuver and C6 parasthesia, and X-rays showed moderate thoracic disc degenerative disease and mild cervical facet degeneration.  Dr. Kitchel diagnosed cervical radiculopathy.  He referred Plaintiff to Dr. Michael Balm, a neurologist, who examined Plaintiff on March 10, 2008.  Plaintiff reported neck pain and heaviness in his left arm.  He told Dr. Balm that, after the back surgery, he had noticed some mild cognitive side effects and a general sense of weakness and aching in his thighs and shoulders.  Plaintiff stated that he had experienced cervical pain a month after surgery, and that walking seemed to aggravate the pain. He also noted a tremor in his left hand, and reported that the hand tended to curl when he

walked.  Plaintiff also stated that he experienced unusual fatigue.

Dr. Balm noted a 1+ hypomimia (expressionless face) and decreased blink rate, 1 to 2+ rigidity in Plaintiff's left arm, and 1+ rigidity in Plaintiff's left leg.  He also noted that Plaintiff had a resting tremor in the right hand, and a reduced arm swing and tremor with activity in Plaintiff's left arm.  Dr. Balm diagnosed chronic myofacial cervicalgia, with an onset of June, 2007; probable Parkinson's disease, with an onset in 2007; L4-S1 laminectomy/foraminotomies with L5-S1 fusion; and chronic mechanical low back and bilateral groin pain.  An MRI of Plaintiff's brain was normal.

In his notes of a visit on April 1, 2008, Dr. Balm indicated that Plaintiff was somewhat depressed, had left-sided hemi-rigidity, continued to show hypomimia, and appeared moderately anxious and mildly dysphoric.  Plaintiff's speech was notable for a 1+ hypokinetic dysarthria.[1] Plaintiff had decreased arm swing at -2 on the left with rigidity at 2+ in the left arm and 1+ in the left leg.  Dr. Balm indicated that his impression was left hemiparkinsonism, and noted that he supported Plaintiff's "application for disability."  Dr. Balm noted the possibility that Plaintiff had coincidental idiopathic Parkinson's disease versus the possibility that a side effect of medication or hypoxic event had caused Plaintiff's Parkinsonism post-operatively.  He opined that, if the condition had occurred post-operatively, it might be a static problem which could improve slowly over the succeeding 12-18 months, but that if it was Parkinson's disease, he expected a slow progression.  Dr. Balm counseled Plaintiff about the significant risk of long-term neurological morbidity, and prescribed Valium.

---

[1]Dysarthria is a speech/language disturbance caused by emotional stress, brain injury, paralysis, incoordination, or spasticity of muscles used to generate speech.  *Stedman's Medical Dictionary*, 26th Ed. (1991), p. 529.

Dr. Mircea Rachita began to treat Plaintiff in June, 2008. Dr. Rachita noted that Plaintiff had an "obvious loss of fine movement of the left hand and an apparent loss of strength in the left leg." Plaintiff told Dr. Rachita that constant fatigue, rigidity and decreased movement, and mid-thoracic pain had made it impossible for him to return to work after his back surgery. Dr. Rachita noted rigidity and a fine resting tremor, and diagnosed Parkinsonism after a lumbar laminectomy, and left arm clonus[2] with shoulder pain. Dr. Rachita stated that

> I do think he is disabled based on the physical exam. He seems to do fair, but obviously not well enough to work as a logger, or actually do anything physically active that involves power tools or strenuous lifting.

Plaintiff began to see Dr. Goodwin again in July, 2008. In notes of a visit on July, 14, 2008, Dr. Goodwin indicated that Plaintiff's motor strength was normal, but that he had "cog-wheeling"[3] and passive flexion and extension of both elbows. Plaintiff had some decreased swinging of the arms, and a slightly flat affect. Dr. Goodwin indicated that Plaintiff might have Parkinson's disease.

In his notes of a visit on August 4, 2008, Dr. Goodwin indicated that Plaintiff had left-sided rigidity and fine resting tremor. He diagnosed Plaintiff with left-sided hemiparkinsonism and cervicalgia radiating into his left shoulder.

During a visit on September 24, 2008, Plaintiff told Dr. Rachita that he had been much more anxious. Dr. Rachita noted that Plaintiff was "very frustrated about being disabled." Dr.

---

[2]Clonus is movement marked by contractions and relaxations of a muscle, occurring in rapid succession. *Stedman's Medical Dictionary*, 26th Ed. (1991), p. 354.

[3]"Cog-wheeling" is a " 'pullback,' jerky or ratcheting effect in an arm or leg perceived when a doctor moves a patient's rigid limb. http://parkinsons.about.com/od/glossary/g/cogwheeling.htm

FINDINGS AND RECOMMENDATION – 7

Rachita described Plaintiff as "emotionally labile," and noted that he had cried during the visit. He noted left-sided rigidity, fine resting tremor, mild bradykinesia, and decreased power on the left.  Dr. Rachita also noted some rigidity on Plaintiff's right side.  He diagnosed major depression, and prescribed Celexa for that condition.  Dr. Rachita recommended counseling, and noted that he "was concerned enough to pick up the phone and call [Schrader's] wife and discuss this issue with her."

Dr. Lawrence Maccree, a neurosurgeon, examined Plaintiff on December 11, 2008. Plaintiff reported neck pain that radiated into the back of his left arm and extended into his first three fingers, as well as numbness and weakness in his left hand and arm.  He reported that his symptoms worsened when he stood or walked, and improved when he was lying down.  Dr. Maccree diagnosed left arm pain and parasthesia in the C5 distribution.  He opined that Plaintiff's symptoms were not explained by the MRI.

Dr. Jerry Boggs, a neurologist, performed electromyographic testing on Plaintiff on December 18, 2008.  A nerve conduction study showed increased insertional activity and muscle irritability of the left-side mid to lower cervical paraspinal muscles.  Dr. Boggs opined that there could be some mild nerve root compromise.

At the request of the Agency, Dr. Michael Villaneuva, a psychologist, examined Plaintiff on March 17, 2009.  Dr. Villaneuva noted that Plaintiff had a "substantial tremor of the upper left extremity" which had developed following his back surgery in 2007.  Plaintiff told Dr. Villaneuva that his doctor had suggested counseling, but that insurance would not pay for a substantial part of the costs.  He reported that he occasionally helped out with the residents at his wife's foster care business, and that for exercise he walked about a half a mile.  Plaintiff told Dr.

FINDINGS AND RECOMMENDATION – 8

Villaneuva that he was no longer able to participate in competitive archery or hunt elk, which he had done in the past.

Dr. Villaneuva noted that Plaintiff ambulated in a "stiff fashion," and had a resting tremor of "some significance" on the left side.  Overall, Plaintiff's  movement was "slow, and stiff in appearance."  He had no tremor on the right side, but had some weakness in his upper right extremity.

Dr. Villaneuva diagnosed depression.  He opined that, because of his apathy, depression, and fatigue,  Plaintiff was moderately limited in his ability to interact appropriately with co-workers and respond appropriately to usual work situations and changes in routine work settings.

At the request of the Agency, Kyle Ingram, a physical therapist, examined Plaintiff on March 18, 2009.  He found that Plaintiff could lift 10 pounds from the floor to the shoulder, could lift 15 pounds from the floor to the waist, could carry 10 pounds for 75 feet, and could push and pull 30 pounds.  He could not do repetitive motions with his left foot.  Plaintiff was able to use his right hand for simple grasping, firm grasping, and fine manipulation.  He could not use his left hand for firm grasping or fine manipulation.  Plaintiff could bend occasionally, squat frequently, crawl occasionally, and climb frequently.  He could raise his right arm above his shoulder level intermittently.  The therapist concluded that the test results were valid, and noted that plaintiff was tearful at times when he could not do things that he thought he should be able to do.  He concluded that, with 15 minute breaks, Plaintiff could sit, stand, walk, or sit/stand for two hours at a time, for 8 hours per day.

In a visit with Dr. Goodwin on May 15, 2009, Plaintiff reported that he had pain in his left shoulder, between his shoulders, in his low back, and in his left leg.  Plaintiff stated that his

left foot and hand were numb.  Dr. Goodwin noted that Plaintiff had a flat affect, and had

"masked facies," an expressionless appearance commonly associated with Parkinson's disease.

See Stedman's Medical Dictionary, 26th Ed. (1991), p. 1067.  He stated that "[i]t does appear that

the patient may have Parkinson's."  Dr. Goodwin was uncertain about the cause of Plaintiff's

pain.  He thought that Plaintiff's thoracic pain was likely degenerative in nature, and

characterized his left leg radicular pain as "status post L1-S5 fusion."  Dr. Goodwin prescribed

hydrocodone.

In a letter dated June 3, 2009, Dr. Rachita indicated that he had reviewed, and generally

agreed with, the evaluations submitted by Dr. Villanueva and the physical therapist.  He opined

that Plaintiff was "unable to return to his prior job" because of his impairment.  Dr. Rachita

stated that he was not experienced enough to determine what kind of work Plaintiff could do, but

that "he certainly cannot use heavy equipment nor do manual labor."

After the ALJ had issued her unfavorable decision, Plaintiff's counsel asked Dr. Boggs to

comment on certain of the ALJ's conclusions.  In a questionnaire dated August 12, 2009,  Dr.

Boggs stated that

> Mr. Schrader definitely has Parkinsonism with predominately left sided involvement.
> This is the cause of the stiffness and slowness of movement in the left side of his
> body, particularly his left arm.  In my opinion, Parkinsonism/Parkinson's Disease is
> a process that leads to severe impairment and can be expected to worsen with time
> since it is a progressive neurologic disease.   The diagnosis is based purely on
> neurologic exam.

Dr. Boggs added that the symptoms of Parkinsonism were stiffness, slowness, and

impaired coordination of Plaintiff's left side, and especially his left arm, which led to impaired

function and ability to use the left side in "normal fluid fashion."  He added that, if Plaintiff did

not respond to treatment for Parkinsonism, his left arm "would be of little use in any

FINDINGS AND RECOMMENDATION – 10

occupational related activity."  Dr. Boggs opined that more than two days per month,  Plaintiff's impairment would prevent him from maintaining a regular work schedule.

In a form that he returned after the ALJ had issued her unfavorable decision, Dr. Goodwin opined that on more than two days per month, Plaintiff's impairment would prevent him from maintaining a regular work schedule.  He stated that he felt "for all practical purposes he is 100% disabled especially given the PCE results."


<u>**Hearing Testimony**</u>

1. <u>**Plaintiff's testimony**</u>

The ALJ asked Plaintiff  about Agency records showing that he had been paid wages after his alleged onset of disability date.  Plaintiff responded that his wife had continued to pay him on the advice of her bookkeeper after he stopped working.  Plaintiff testified that his wife took care of the foster care business and he had signed a tax return showing those wages because he thought he was supposed to.  He testified that, though he was occasionally alone in the house with residents while his wife worked in the yard, he had not worked since he had undergone back surgery in 2007.

Plaintiff testified as follows concerning his activities, impairments, and symptoms. Plaintiff can sit in a recliner for a couple of hours, but can sit in a regular chair for only an hour. He can stand or walk for about 20 minutes before pain in his lower left leg and numbness in his left foot force him to sit.  Plaintiff lies down for 20 minutes to an hour three to five times a day to relieve the pain in his back.  He takes hydrocodone two or three times a day.  The medication takes "a little bit of the edge off" his pain, but he does not like to take it because it makes his

FINDINGS AND RECOMMENDATION – 11

thinking "a little cloudy" at times.  Acupuncture treatments help relieve his pain somewhat for a few days, allowing him to be more active.  On the advice of a physical therapist, Plaintiff ices his neck and shoulder a couple times a day for 20 to 30 minutes to relieve pain.

In addition to leg pain and numbness in his arms and legs, Plaintiff gets "shaky all the time," and his back and neck tremble.  Plaintiff goes to the store with his wife once or twice a week.  He sometimes does laundry, and sometimes  mows the yard–a task that takes him seven minutes.  Plaintiff spends most of the time reading the bible or watching television.

 Plaintiff is sad, but does not think that he has a problem with depression.  It is difficult for Plaintiff to talk about his situation, and he has not seen a counselor because he does not want to be put on medication.  He has had an adverse reaction to most medications that he has taken.  Though he does not drop things, it is difficult for Plaintiff to grip, even with his right hand, and he has trouble brushing his teeth with his right hand.  Plaintiff can do very little with his left hand.  He thought he might be able to work if he could lie down a few times a day.  If he does not lie down during the day, he becomes exhausted.

## 2. **Vocational Expert's testimony**

The ALJ posed a vocational hypothetical to the VE describing an individual who could lift 15 pounds occasionally and 10 pounds frequently primarily using the right arm, and using the left arm only as an assist; should perform no overhead work with either arm and no pushing and pulling with the upper left and lower extremities; could not use the non-dominant left hand for anything other than simple grasping but had no limits on the right hand; should not be exposed to hazards; should have no public contact; should never climb ladders, ropes and scaffolds; should never kneel, crawl, or crouch; should only occasionally bend or stoop; and was limited to jobs

that were no more complex than one to three steps, were consistent with SVP2, and involved established routine with few changes.

The VE testified that an individual with these limitations could not perform Plaintiff's past relevant work.

The ALJ then added to the vocational hypothetical the capacity to sit, stand, and walk (each) for six hours during an eight-hour work day, with no more than two hours devoted to any activity at a time, but the ability to do the activities in combination for eight hours.

The VE testified that an individual described by the hypothetical could work as a tray setter, a small goods sorter, or as an alarm system monitor.  In response to a question by the ALJ the VE testified that an individual who needed the opportunity to lie down at will or at unpredictable intervals for unpredictable amounts of time could not work.

In response to questioning by Plaintiff's counsel, the VE testified that missing work two or more days a month "usually results in fairly early termination," and that a marked limitation in ability to maintain concentration would affect productivity and likely result in termination.

### ALJ's Decision

At the first step of her disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on May 1, 2007.

At the second step, she found that Plaintiff had the following severe impairments: chronic cervical myofascial syndrom, left cervical brachial syndrome, depression, and "low back pain status-post L5 laminectomy and partial L4-S1 laminectomies and instrumental fusion at L5-S1 (20 CFR 404.1520(c))."

FINDINGS AND RECOMMENDATION – 13

At the third step, the ALJ next found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the presumptively disabling impairments in the "listings," 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1525; 404.1526).

The ALJ next evaluated Plaintiff's residual functional capacity. She found that Plaintiff had moderate difficulties in social functioning; had the functional capacity required to lift and carry 15 pounds occasionally and 10 pounds frequently, primarily using his right arm, with his left arm used only to assist; could not perform overhead work with either arm and could not push or pull with his left upper or lower extremities; could not use his non-dominant left hand for any activity other than simple grasping, and had no limitation in the use of his right hand.  The ALJ found that Plaintiff could sit continuously for two hours at a time, for up to six hours during an eight-hour work day, could stand and/or walk continuously for two hours at a time for up to a total of six hours per eight-hour work day; and could not perform any climbing of ladders, ropes or scaffolds or any kneeling, crawling, or crouching.  She found that Plaintiff was restricted from public contact, required work with established routine with few changes, and was limited to jobs with no more than one to three steps, consistent with SVP II entry-level employment.  In evaluating his residual functional capacity, the ALJ found that Plaintiff's allegations concerning the severity of his impairments and limitations were not entirely credible.

At the fourth step of her disability analysis, the ALJ found that Plaintiff could not perform his past relevant work as an assistant foster home care provider.

At the fifth step, the ALJ found that Plaintiff could perform other jobs that existed in substantial numbers in the national economy.  Based upon the testimony of the VE, she

concluded that Plaintiff could work as a tray setter, small goods sorter, or alarm system monitor. Accordingly, she found that he was not disabled within the meaning of the Act.

### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

### Discussion

FINDINGS AND RECOMMENDATION – 15

Plaintiff contends that the ALJ erred in failing to include Parkinson's disease as a "severe" impairment, failing to provide adequate reasons for concluding that he was not wholly credible, and failing to meet the burden of establishing that he could perform other jobs that existed in substantial numbers in the national economy.

1. **Severe Impairment Assessment**

Plaintiff contends that the ALJ erred in failing to include  Parkinson's disease or Parkinsonism among his severe impairments, and failed to include the limitations caused by such impairment in assessing his residual functional capacity.  Though the failure to find that Parkinson's disease or Parkinsonism was one of Plaintiff's severe impairments may not have been attributable solely to the ALJ, I agree that it should have been included.

The "severity" analysis at step two of the disability determination process "is a de minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987); SSR 85-28; Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)).  An ALJ can find that an impairment is 'not severe' only if the evidence establishes that it has "no more than a minimal effect on an individual's ability to work."  Id.

Ample evidence in the medical record supported a diagnosis of Parkinson's disease or Parkinsonism, and supported the conclusion that the resulting symptoms would have more than a minimal effect on Plaintiff's ability to work.  In March, 2008, Dr. Balm, a neurologist, noted a number of symptoms that were consistent with Parkinson's disease, and diagnosed "probable Parkinson's disease."  In April, 2008, Dr. Balm diagnosed left hemiparkinsonism.  In June, 2008, Dr. Rachita, Plaintiff's treating physician, diagnosed Parkinsonism.  In August, 2008, Dr.

FINDINGS AND RECOMMENDATION – 16

Goodwin diagnosed left-sided hemiparkinsonism.  In March, 2009, Dr. Villanueva, an examining psychologist, noted a number of symptoms that were consistent with Parkinsonism. In May, 2009, Dr. Goodwin likewise noted a number of symptoms consistent with Parkinson's disease, and stated that Plaintiff might have that disease.  Reviewing Agency medical consultants included hemiparkinsonism among Plaintiff's medically determinable impairments.

In material submitted after the ALJ had issued her unfavorable decision, Dr. Boggs stated that Plaintiff "definitely has Parkinsonism with predominately left-sided involvement," and opined that Plaintiff's impairments would cause him to miss work more than two days per month.  In another form submitted after the decision had been issued, Dr. Goodwin likewise opined that Plaintiff's impairments would cause him to miss work more than two days per month.  This material was submitted to the Appeals Council, and was not returned to the Plaintiff.

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are entitled to greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based upon substantial evidence in the record."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting the opinion of a treating physician that is not contradicted by another doctor.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).

Plaintiff's medical record includes frequent references to the hypomimia, masked facies, rigidity, tremors, cog-wheeling, reduced arm swing, dysarthria, loss of fine hand movement,

stiffness, and apparent weakness that are associated with the Parkinson's/Parkinsonism, and

Plaintiff's treating physicians, including neurologists, diagnosed Parkinson's disease,

Parkinsonism, or hemiparkinsonism.  Reviewing Agency medical consultants listed

hemiparkinsonism as a medically determinable impairment, and the record does not include a

medical opinion contradicting a Parkinson's disease/Parkinsonism diagnosis.

 The ALJ did not explicitly state  reasons for either concluding that

Parkinson's/Parkinsonism was not established by the medical record, or for concluding that it

was not a severe impairment.  However, from her observation that "extensive testing has failed

to reveal specific lesions or mechanisms that would account for left-sided deficits," it appears

that she doubted the diagnosis.  If the ALJ did not accept the opinions of treating, examining,

and reviewing doctors supporting a Parkinsonism diagnosis, she was required to provide clear

and convincing reasons for its rejection.  Her reference to the absence of "specific lesions or

mechanisms" to explain Plaintiff's left-sided deficits does not satisfy that requirement: The

Commissioner does not dispute Plaintiff's assertion that Parkinson's disease is not diagnosed by

such tests as imaging or blood analysis, but instead is based upon a doctor's clinical judgment of

the symptoms manifested by a patient.  See e.g., http://www.umm.edu/parkinsons/diagnosis.htm.


 The Commissioner now contends that Parkinson's disease was not established in the

record before the ALJ because the ALJ had issued her decision before Dr. Boggs unambiguously

diagnosed Parkinsonism.  This argument fails for two reasons.  First, evidence in the medical

record compiled and available before the ALJ issued her decision clearly supported a

Parkinson's disease/Parkinsonism diagnosis.  Second, where, as here, the Appeals Council does

not return evidence that is submitted post-hearing, that material becomes part of the record and is subject to judicial consideration.  See, e.g., Harman v. Apfel, 211 F.3d 1172, 1179-80 (9th Cir. 2000); Ramirez v. Shalala.8 F.3d 1449, 1451 (9th Cir. 1993).

The Commissioner also contends that, even if Parkinson's disease/Parkinsonism should have been included as a severe impairment, its omission was harmless error because the ALJ properly assessed Plaintiff's limitations that could have been attributed to the disease.  This argument parallels the ALJ's assertion that, even if Plaintiff "is found to have Parkinson's disease, a diagnosis alone is insufficient to establish disability, absent accompanying functional restrictions."

I disagree with the Commissioner's assertion that failure to consider Parkinson's disease/Parkinsonism as a severe impairment was at most a harmless error.  Plaintiff testified that he needs to rest during the day, and the VE testified that no jobs were available for an individual with such needs.  If the ALJ had credited a Parkinson's diagnosis, she might have considered fatigue associated with the disease in her assessment of Plaintiff's residual functional capacity. If the ALJ had concluded that Plaintiff had Parkinson's disease or Parkinsonism, she might have generally found Plaintiff's description of his symptoms and impairments more credible.  In addition, she might have concluded that the impairments to Plaintiff's hands were more significant than those included in the RFC, which assumed that Plaintiff could perform simple gripping with his left hand and could use his right hand without limitation.  The medical record included evidence that Plaintiff had some tremor and rigidity on the right side, with cog-wheeling in both elbows, and Plaintiff testified that he had difficulty brushing his teeth with his right hand.    Any change in the assessment of Plaintiff's ability to use his hands could be

significant: The VE testified that, though the three jobs that the ALJ found Plaintiff could perform primarily required use of the non-dominant hand as an assist, there was also some requirement for fine manipulation and firm grasping by the non-dominant hand.  As Plaintiff correctly notes, the physical therapist's physical capacity assessment upon which the ALJ heavily relied indicated that Plaintiff could not use his left hand in those ways.

Where, as here, an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985).  Whether an action is remanded for further proceedings depends on the likely utility of additional Agency consideration.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited.  Smolen, 80 F.3d at 1292.

Parkinson's disease/Parkinsonism should have been included as one of Plaintiff's severe impairments, and all the functional impairments resulting from that condition should have been included in the analysis of Plaintiff's residual functional capacity and ability to work.[4]  Based

---

[4]Because Dr. Boggs' statement that most clearly supported a diagnosis of Parkinsonism was submitted after the ALJ had issued her unfavorable decision, any failure to credit that diagnosis, and to conclude that this disease constituted a severe impairment, was not the ALJ's

upon a careful review of the medical record, I conclude that this error requires reversal and

remand for an award of benefits.  There are no outstanding issues that must be resolved before a

determination of disability can be made.  If Parkinson's disease/Parkinsonism had been accepted

as a severe impairment and the opinions of Plaintiff's doctors as to the resulting functional

effects had been credited, a finding of disability would have been required.

## 2. **ALJ's Credibility Determination**

In evaluating Plaintiff's residual functional capacity, the ALJ found that Plaintiff's

allegations concerning the severity of his symptoms and impairments were not credible to the

extent that they were inconsistent with her RFC assessment.  Plaintiff contends that the ALJ

failed to adequately support this assertion.

## a. **Applicable Standards**

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If

a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit

the claimant's statements concerning the severity of his symptoms merely because they are

unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir.

1998) (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(en banc)).  If a claimant

produces medical evidence of an underlying impairment and there is no evidence of malingering,

the ALJ must provide specific, clear and convincing reasons, supported by substantial evidence,

to support a determination that the claimant was not wholly credible.  Thomas v. Barnhart, 278

F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p.  If an ALJ's credibility determination is supported

_____

alone.  This does not alter the subsequent analysis of the consequences of the error.

FINDINGS AND RECOMMENDATION – 21

by substantial evidence, it must be upheld even if some of the reasons cited by the ALJ are not correct.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In addition, SSR 96-7 requires an ALJ to consider the entire record and to examine several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies or contradictions between the claimant's complaints and his activities of daily living.  Thomas, 278 F.3d at 958-59 (9th Cir. 2002).

b. **Analysis**

Because Plaintiff produced evidence of underlying medical conditions that would be expected to produce some symptoms and there was no evidence of malingering, the ALJ was required to support her determination that Plaintiff was not wholly credible with specific, clear and convincing reasons that were supported by substantial evidence.

In support of her credibility determination, the ALJ asserted that Plaintiff's "willingness to falsify information" included in his tax returns "impacts the credibility of his statements."  She also asserted that  Plaintiff's allegations of right arm impairment were not supported by "any findings of any weakness or sensory deficit on the right;" the medical record includes normal findings; Plaintiff allegations of left sided symptoms were "out of proportion to the objective

findings; Plaintiff displayed an "extreme" weakness in the upper and lower extremities during his physical capacities evaluation that was inconsistent with previous medical findings; and Plaintiff's reports concerning the severity of his pain and his use of pain medication were inconsistent.  It appears that the ALJ's observation that testing has not revealed "specific lesions or mechanisms that would account for the left-sided deficits" was also related to the credibility assessment.

These are not clear and convincing reasons for concluding that Plaintiff was not wholly credible.  Beginning with the last of the reasons cited in the above paragraph, the absence of "specific lesions or mechanisms" to account for Plaintiff's "left-sided deficits" is wholly consistent with the Parkinson's disease/Parkinsonism to which doctors repeatedly attributed many of Plaintiff's difficulties.  As noted above, the Commissioner does not dispute Plaintiff's assertion that the disease is diagnosed based upon symptoms and cannot be shown through X-rays, MRIs, or blood analysis.

Nor are the other reasons for discrediting Plaintiff clear and convincing.  Plaintiff testified that, on the advice of a bookkeeper, his wife paid him for work he did not do.  He also testified that his wife managed the accounting for her business and prepared tax returns, and he simply signed whatever documents he was asked to sign.  Signing the return in question is not clear evidence that Plaintiff will dissemble to his own advantage.  Signing a tax return indicating that he had earned wages in 2007 was not necessarily to Plaintiff's advantage, given that it could both subject him to potential tax liability and damage his opportunity to obtain the disability benefits that he applied for on the same day that his 2007 tax return was due.

Contrary to the ALJ's assertions, the medical record did include findings of weakness on

FINDINGS AND RECOMMENDATION – 23

Plaintiff's right side, and the summary of the Physical Capacities Evaluation (PCE) does not indicate that Plaintiff displayed a level of exaggerated weakness in the upper and lower extremities. Though Plaintiff's most significant problems were on the left side, Dr. Rachita noted right-sided rigidity, Dr. Balm noted right-sided tremor, and Dr. Villanueva noted weakness on Plaintiff's right side. The physical therapist who conducted the PCE noted some loss of strength but did not describe it as "extreme," and did not state or imply that Plaintiff manipulated the results or inaccurately described his capabilities. In addition, the finding of strength loss was consistent with the findings made by Dr. Rachita and Dr. Villanueva. Both these doctors noted weakness in Plaintiff's upper extremities, and in June, 2008, Dr. Rachita noted "apparent weakness in the left leg."

The existence of some normal findings in Plaintiff's medical record is not inconsistent with the level of impairment to which Plaintiff testified. That some findings were normal does not alter the fact that many others were not. Nothing in the isolated reports of normal muscle bulk and strength and normal gait cited by the ALJ is inconsistent with Plaintiff's diagnosed Parkinson's disease/Parkinsonism or the significant impairments of which Plaintiff complained.

The ALJ's assertion that Plaintiff did not complain of severe pain until the PCE in March, 2009, and contention that his reports of pain were inconsistent, are not convincing. The record includes Plaintiff's reports of significant pain beginning in 2006, and variations in the level of pain reported are as likely to indicate credibility as its absence.

Finally, a careful review of the hearing transcript does not support the ALJ's assertion that Plaintiff's description of his use of pain medications was inconsistent. In response to questioning by the ALJ, Plaintiff testified that he used hydrocodone two or three times per day.

FINDINGS AND RECOMMENDATION – 24

The ALJ characterized his later testimony that he sometimes took only part of a pill at a time as inconsistent with that testimony.  It is not.

When an ALJ improperly rejects a claimant's testimony regarding his limitations, and the claimant would be disabled if the testimony were credited, courts do not remand solely to allow an ALJ to make further findings regarding the testimony.  Lester, 81 F.3d at 834 (citing Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1401 (9th Cir. 1988)).  Instead, the testimony is credited as a matter of law.  Varney, 859 F.2d at 1401.  Where there are no outstanding issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited, remand for an award of benefits is appropriate.  Smolen, 80 F.3d at 1292.

The ALJ here failed to provide sufficient support for her credibility determination, and there are no outstanding issues that must be resolved before a determination of disability can be made.  Plaintiff testified to a number of very significant impairments, including a need to lie down at unpredictable times for periods of unpredictable duration that the VE testified would eliminate the possibility of any work.  Accordingly, if the ALJ had credited Plaintiff's testimony, she would have been required to find him disabled.  Under these circumstances, this action should be remanded to the Agency for an award of benefits.

3. **Finding that Plaintiff Could Perform "Other Work"**

In order to be accurate, an ALJ's hypothetical to a VE must set out all of a claimant's impairments and limitations.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  If the assumptions included in a vocational hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value.  Id.

FINDINGS AND RECOMMENDATION – 25

Plaintiff contends that the Commissioner did not meet his burden of establishing that he could perform "other work" that existed in substantial numbers in the national economy, because the vocational hypothetical posed to the VE did not include all of his impairments. For the reasons set out in the discussion of the assessment of Plaintiff's severe impairments, I agree.

## Conclusion

A Judgment should be entered REVERSING the Commissioner's decision denying Plaintiff's application for benefits and REMANDING the action to the Agency for an award of benefits.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 12, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 23rd day February, 2012.

 /s/ John Jelderks_____

John Jelderks
U.S. Magistrate Judge